**Deborah BROWNELL, Plaintiff,**

v.

**ROADWAY PACKAGE SYSTEM, INC. d/b/a RPS, Defendant.**

No. Civ. 97–CV–1034.

United States District Court, N.D. New York.

March 19, 1999.

Karen A. Butler, Thuillez, Ford Law Firm, Albany, NY, for plaintiff.

Evan J. Spelfogel, Epstein, Becker Law Firm, New York City, for defendant.

## MEMORANDUM DECISION AND ORDER

RALPH W. SMITH, Jr., United States Magistrate Judge.

This is a sexual harassment suit filed by Plaintiff Deborah Brownell against her former employer, Defendant RPS. Jurisdiction in this matter is premised upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (hereinafter "Title VII"). Presently before the Court is a dispute between the parties regarding the extent to which Plaintiff may discover written statements that were given by RPS employees to Defendant's counsel prior to and after the time that Plaintiff was terminated. For the reasons set forth below, the Court concludes that these statements are discoverable and must be produced to Plaintiff.

## I. Background

Plaintiff was hired as a secretary at RPS' Albany terminal in Latham, New York, on September 9, 1994. At all times relevant, Plaintiff was one of only two women at the Latham terminal. Plaintiff alleges that, beginning in April or May of 1996, several of her male co-workers subjected her to unwelcome sexual advances and touching and a hostile work environment. Plaintiff further claims that David Durette, the Latham terminal manager, either participated in the alleged incidents, personally witnessed them, or was informed of them after they occurred. Plaintiff alleges that Durette did nothing to stop the offending behavior.

In late November 1996, Plaintiff submitted a hand-written summary of her allegations to RPS' regional manager, Alex Kapinos, and made a verbal complaint of sexual harassment. Plaintiff alleges that no further action was taken until December 2, 1996, when she was contacted by RPS' in-house counsel, Gary Dunbar. Although the parties disagree as to the exact course of the conversation, it is clear that Dunbar did not discuss the details of Plaintiff's allegations with Plaintiff because, by that point, she was represented by counsel. On January 7, 1997, Plaintiff met with RPS' regional human resources manager, Heather Hart. Although the parties again disagree as to the details of the meeting, they agree that Plaintiff was placed on paid administrative leave effective that afternoon.

On April 3, 1997, Defendant's retained counsel, Evan J. Spelfogel, sent a letter to Plaintiff's counsel, Karen A. Butler, and stated that RPS was terminating Plaintiff effective April 4, 1997. Plaintiff subsequently filed a charge with the Equal Employment Opportunity Commission, and, after receiving notice of her right to sue, filed a complaint against RPS on July 21, 1997. In her complaint, Plaintiff accused RPS of the following acts: (1) creation of a hostile work environment that altered the terms and conditions of her employment on the basis of her sex, in violation of Title VII; (2) retaliation for engaging in protected behavior by terminating her from her position, in violation of Title VII; (3) violation of New York's Human Rights Law, N.Y. Executive Law § 290 *et seq.*; (4) intentional infliction of emotional distress; and (5) negligent supervision of its employees. In its answer, filed on September 26, 1997, Defendant denied the charges against it and argued, inter alia, that "Plaintiff's claims are barred because ... [Defen-

dant] fully and fairly investigated [her] allegations and took prompt and appropriate action consistent with the results of its investigation." Def.'s Answer at ¶ 63. The answer was signed by Attorney Spelfogel as counsel for Defendant.

Plaintiff presently seeks copies of five written statements that RPS employees provided to Attorney Spelfogel on March 10, 1997 and one statement made by an RPS employee to Attorney Spelfogel on April 15, 1997. In response, RPS argues, first, that it gathered the statements after it completed its investigation of Plaintiff's sexual harassment allegations in an effort to obtain information about Plaintiff's disruptive and inappropriate workplace behavior. In effect, RPS contends that it conducted two investigations and that the results of this "second" investigation were not asserted as a defense at ¶ 63 of its answer. Alternatively, RPS argues that these statements were taken in response to Plaintiff's threat of litigation and that they are accordingly protected by the attorney-client privilege and the work-product doctrine. As discussed below, the Court rejects the argument that RPS conducted two separate investigations and further holds that, although the statements are protected, RPS waived its right to invoke either privilege by placing the reasonableness of its investigation in issue.

## II. *Sexual Harassment Standards*

■ Title VII prohibits an employer from discriminating against its employees on the basis of sex with respect to the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1).[1] The protections under Title VII extend to so-called "hostile work environment" cases, in which " 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Where the harassing employee is the victim's co-employee, the employer may only be held liable where the employer either provided no reasonable means of complaint or knew of the harassment and did nothing about it. *Id.* at 766 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)). By contrast, where the harassing employee is the victim's supervisor, the employer is presumptively liable unless it demonstrates (1) that it exercised reasonable care to prevent and promptly correct the supervisor's sexual harassment and (2) that the victim unreasonably failed to take advantage of any corrective or preventive opportunities provided by the employer or to otherwise avoid harm. *Id.* at 767 (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, ——, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998)).[2] In most cases, therefore, the employer's liability, or lack thereof, often depends upon what it knew and how it handled this knowledge.

## III. *Defendant's Investigation of Plaintiff's Sexual Harassment Allegations*

Initially, and contrary to Defendant's present assertions, the Court finds that Defendant's investigation of Plaintiff's sexual harassment claims was conducted simultaneously with its investigation of Plaintiff herself. This conclusion is based, first, upon an examination of the contested statements. None of the RPS employees confined themselves to commenting solely upon Plaintiff's behavior at the workplace; rather, each em-

---

1. Because claims brought pursuant to New York's Human Rights Law (the "HRL"), N.Y.Exec.Law § 290 *et seq.,* are analyzed in a virtually identical manner as claims brought pursuant to Title VII, the Court's analysis of the issues with regard to Plaintiff's Title VII claims applies equally to the issues with regard to her HRL claim. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); *Leibovitz v. New York City Transit Auth.,* 4 F.Supp.2d 144, 148 (E.D.N.Y.1998).

2. This affirmative defense is not available, however, where a supervisor's harassing conduct culminates in a "tangible employment action" such as discharge, demotion, or undesirable reassignment. *Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at ——, 118 S.Ct. at 2293.

ployee also discusses, in varying detail, Plaintiff's allegations of sexual harassment.[3] These statements thus demonstrate that RPS, through its employees, participated in one investigation that included both a examination of Plaintiff's allegations and a discussion of Plaintiff's workplace behavior.

The Court's conclusion is reinforced by the language used by Attorney Spelfogel to Attorney Butler in his letter of April 3, 1997. At ¶ 3 of his letter, Attorney Spelfogel states that "[w]e have thoroughly investigated Ms. Brownell's allegations and find that the incidents she refers to either never happened, did not happen in the manner she alleges, or if they occurred at all, were isolated and have been taken out of context by her." At ¶ 4 of his April 3, 1997 letter, Attorney Spelfogel continues,

> *Additionally, our investigation has confirmed that* (i) during her last several months at work, Ms. Brownell's performance was poor, she was insubordinate and engaged in inappropriate behavior to customers, fellow employees and management, and she herself engaged in sexually harassing conduct toward others; and (ii) particularly during her last few days at work she behaved in such a way as to create an intimidating, hostile or offensive work environment for others (emphasis added).

Had Defendant conducted two separate investigations, Attorney Spelfogel presumably would not have utilized the language emphasized above, which indicates, not that Defendant conducted two separate investigations, but rather that Defendant's one investigation of Plaintiff yielded two distinct results.

The Court further finds that RPS' investigation did not conclude until well after January 7, 1997. In her June 16, 1998 deposition, Heather Hart testified that, at the end of her meeting with Plaintiff on January 7, 1997, she summarized the status of RPS' investigation as follows:

I had told—I basically had told Deborah that what we were really trying to do in terms of the conversation also was to establish a working relationship in the Albany office so that Deborah could come back to work and make sure that *until the investigation was totally completed,* because, again, I wasn't involved in the—I wasn't the investigator, so to speak. I wanted to make sure that now she was back from the Christmas holidays, that we had a good working relationship in the office and that she felt comfortable with it. That's really what the conversation was designed to do. . . .

June 16, 1998 Dep. of Heather Hart at 63 (emphasis added). According to Hart, therefore, Defendant's investigation of Plaintiff's allegations was not complete as of January 7, 1997.

Defendant's investigation continued on March 10, 1997, when five RPS employees provided statements to Attorney Spelfogel. As discussed above, each statement discusses Plaintiff's allegations of sexual harassment, as well as Plaintiff's workplace behavior. These statements thus indicate that, as of March 10, 1997, Defendant was still investigating Plaintiff's claims.

Shortly after Attorney Spelfogel met with the five RPS employees, two additional RPS employees were interviewed by Hart on March 24, 1997. Hart testified that she spoke with Anne Conaway, an account representative at the Latham terminal, in order "to get an idea in terms of—about Deborah's behavior or also the—how she was treated in the office as a female." *Id.* at 92. Hart testified that she also spoke with Gary Pagano, one of the RPS employees whom Plaintiff had accused of sexually harassing her, in order to review Plaintiff's allegations with him and to make an official statement. *Id.* at 94. Hart's testimony thus indicates that, as of March 24, 1997, Defendant was still assessing the credibility of Plaintiff's allegations by comparing them with Conoway's work experiences and by requesting Paga-

---

**3.** Indeed, in its privilege log, Defendant summarizes the statement submitted by RPS employee Ron Rogers to Attorney Spelfogel on April 15, 1997 as "Letter re[:] 1–7–97 incident with Brownell." This incident is one of several listed by Plaintiff in her complaint in support of her claim of sexual harassment; it is thus obvious, even without examining the document itself, that this statement is not confined merely to a discussion of Plaintiff's workplace behavior.

no's versions of the events about which Plaintiff complained.

Subsequently, Attorney Spelfogel wrote to Attorney Butler on April 3, 1997 that:

As you know, with the exception of several days January 4–7, 1997, Ms. Brownell has not reported to work or performed any services for the Company since approximately December 12, 1996. Notwithstanding, and *pending the completion of our investigation,* the Company retained Ms. Brownell on leave of absence, with full pay.

Apr. 3, 1997 letter from Attorney Spelfogel to Attorney Butler at ¶ 5 (emphasis added). As Attorney Spelfogel continues at ¶ 6 of his letter, RPS decided to revoke Plaintiff's administrative leave and to terminate her effective April 4, 1997. Because Plaintiff was not removed from administrative pay until April 4, 1997, it would appear that RPS completed its investigation on April 3, 1997. The Court finds, however, that RPS' investigation continued beyond this date. On April 15, 1997, RPS employee Ron Rogers submitted a statement to Attorney Spelfogel describing his version of a January 7, 1997 conversation that he had with Plaintiff. The Court has reviewed this statement in camera and notes that it addresses one of the alleged instances of sexual harassment that Plaintiff has included in her complaint. Accordingly, it is clear that RPS did not conclude its investigation of Plaintiff's claims until April 15, 1997 at the earliest.[4]

Because the Court finds that Defendant only conducted one investigation of Plaintiff which did not conclude until April 15, 1997 at the earliest, the statements that Attorney Spelfogel elicited from RPS employees on March 10, 1997 and April 15, 1997 were necessarily included in RPS' affirmative defense at ¶ 63 of its answer. Thus, the Court must next determine whether the statements fall within the scope of the attorney-client privilege and work-product doctrine.

## IV. *The Attorney–Client Privilege*

The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege applies even where the client is a corporation, *id.* at 394–95, 101 S.Ct. 677, and its application must be determined on a case-by-case basis. *Id.* at 396, 101 S.Ct. 677. The elements of the privilege are that (1) the person asserting the privilege is or sought to become a client; (2) the person to whom the information at issue was given (a) is a member of the bar or his or her subordinate and (b) was acting as a lawyer when the information was given; (3) the information at issue relates to a fact about which the attorney was informed by the client without the presence of strangers and for the purpose of obtaining a legal opinion, legal assistance, or legal services and not for the purpose of committing a tort or crime; and (4) the privilege has been claimed and not waived by the client. *In re Vantage Petroleum Corp.,* 40 B.R. 34, 39 (Bankr. E.D.N.Y.1984) (citing *United States v. United Shoe Mach. Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)).

In the present case, the Court finds that the first three elements of the privilege have been established. First, RPS is a client of Attorney Spelfogel, who is a member of the bar. Second, because the RPS employees provided their statements to Attorney Spelfogel so that he could advise RPS how to handle Plaintiff's anticipated legal action, the Court finds that Attorney Spelfogel was acting as an attorney when he received the statements. Third, based upon the facts surrounding this case, the Court finds that RPS employees provided their statements to Attorney Spelfogel for the purpose of obtaining his legal assistance and not for the purpose of committing a tort or a crime. Further, the Court assumes for present purposes that

---

4. Because the April 15, 1997 statement from Rogers to Attorney Spelfogel is the most recently created document that has been listed by Defendant in its privilege log, the Court assumes that no further statements were given by RPS employees to Attorney Spelfogel regarding Plaintiff's claims. To the extent that any statements were subsequently made, such statements would indicate that Defendant's investigation of Plaintiff's claims extended beyond April 15, 1997.

these statements were not provided to Attorney Spelfogel in the presence of strangers. Thus, the Court finds that the statements provided to Attorney Spelfogel on March 10, 1997 and April 15, 1997 fall within the scope of the attorney-client privilege.

■ The Court finds, however, that RPS waived its right to invoke the privilege by asserting the adequacy of its investigation as a defense to Plaintiff's claims of sexual harassment. First, by arguing that it "fully and fairly" investigated Plaintiff's allegations while objecting to the production of statements obtained in the course thereof, Defendant is attempting to use the privilege as both a sword and a shield. This it may not do. *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991). Rather, equity requires that Plaintiff be permitted to explore the parameters of the investigation in order to rebut this affirmative defense. Second, by asserting the adequacy of its investigation as a defense to Plaintiff's allegations, Defendant has implicitly waived the attorney-client privilege by placing the investigation "in issue." Whether an employer's response to an employee's allegation of sexual harassment is reasonable must be assessed from the totality of the circumstances, including "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 65 (2d Cir.1998). Where, as here, the employer defends itself by relying upon the reasonableness of its response to the victim's allegations, the adequacy of the employer's investigation becomes critical to the issue of liability. The only way that Plaintiff, or the finder of fact, can determine the reasonableness of Defendant's investigation is through full disclosure of the contents thereof.

In *Harding v. Dana Transp., Inc.,* 914 F.Supp. 1084 (D.N.J.1996), the District of New Jersey considered analogous facts and held that the privilege must in fairness yield to a plaintiff's ability to effectively prepare her sexual harassment case. As the court in *Harding* stated:

> [Defendant] has attempted to utilize the results of [its counsel's] investigation both as a defense to liability under Title VII and as an aspect of its preparation for the sexual discrimination trial itself. By asking [its counsel] to serve multiple duties, the defendants have fused the roles of internal investigator and legal advisor. Consequently, [Defendant] cannot now argue that its own process is shielded from discovery. Consistent with the doctrine of fairness, the plaintiffs must be permitted to probe the substance of [Defendant's] alleged investigation to determine its sufficiency. Without having evidence of the actual content of the investigation, neither the plaintiffs nor the fact-finder at trial can discern its adequacy. Consequently, this court finds that [Defendant] has waived its attorney-client privilege with respect to the content of [its counsel's] investigation of the plaintiffs' allegations. This waiver extends to documents which may have been produced by [its counsel] or any agent of Defendant [ ] that concern the investigation.

*Id.* at 1096. The court's analysis in *Harding* has been adopted by other jurisdictions that have been presented with similar issues. *See Peterson v. Wallace Computer Servs., Inc.,* 984 F.Supp. 821, 825 (D.Vt.1997); *Pray v. New York City Ballet Co.,* 1997 WL 266980, *1–*3 (S.D.N.Y.1997); *Johnson v. Rauland-Borg Corp.,* 961 F.Supp. 208, 211 (N.D.Ill. 1997); *Wellpoint Health Networks, Inc. v. Superior Court,* 59 Cal.App.4th 110, 68 Cal. Rptr.2d 844, 855–56 (1997). The Court has reviewed these decisions, and it finds their reasoning to be persuasive. Accordingly, the Court holds that Defendant waived the attorney-client privilege by asserting the adequacy of its investigation as an affirmative defense to Plaintiff's complaint.[5]

---

5. The fact that Defendant elicited a statement from RPS employee Ron Rogers after the date that it terminated Plaintiff does not change this result. *See Johnson,* 961 F.Supp. at 209 (noting that defendant retained counsel immediately following plaintiff's resignation in order to investigate her allegations of sexual harassment); *Harding,* 914 F.Supp. at 1088, 1092 (noting that defendant retained an attorney to investigate plaintiffs' claims after plaintiffs filed a sexual

### V. *The Work–Product Doctrine*

As a general rule, a party may discover documents that were prepared in anticipation of litigation by or for another party or by or for the other party's representative only upon a showing of substantial need. Fed.R.Civ.P. 26(b)(3). The Court finds that Plaintiff has satisfied this standard. First, as discussed above, the written statements that were given by RPS employees to Attorney Spelfogel are crucial to the determination of whether or not RPS can be held liable for the acts that allegedly occurred. Accordingly, Plaintiff has demonstrated the "substantial need" necessary to compel production of these statements. *See Peterson,* 984 F.Supp. at 826 (reaching same conclusion). Second, as with the attorney-client privilege, the Court finds that Defendant impliedly waived the protections of the work-product doctrine by asserting the adequacy of its investigation as an affirmative defense. *See Harding,* 914 F.Supp. at 1099 (holding that, in the interests of justice, a defendant may not withhold essential information with regard to its internal investigation of a plaintiff's sexual harassment claim). Accordingly, the Court determines that the statements obtained by Attorney Spelfogel are discoverable.

The discoverability of these statements, however, is not absolute. Rather, the Court must protect "against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed.R.Civ.P. 26(b)(3). The Court has conducted an in camera examination of the statements that were given to Attorney Spel-

fogel and finds that they are fully discoverable. Each statement is written in the first person and is signed by the applicable employee,[6] and none reflects the impressions, conclusions, opinions, or legal theories of Attorney Spelfogel. Because the statements thus contain no material which must be redacted from them, the Court accordingly holds that Defendant must produce them to Plaintiff in their original form.

### VI. *Conclusion*

For the reasons set forth above, it is hereby

ORDERED that Defendant produce copies of each statement provided by an RPS employee to Attorney Spelfogel regarding the allegations in Plaintiff's complaint by no later than two weeks from the date of this Order.

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. § 636(b)(1)(A), Fed.R.Civ.P. 72(a), and Local Rule 72.1(b), any party may appeal this Memorandum Decision and Order within ten (10) days after being served with a copy thereof. The party must file with the Clerk of the Court, and serve upon all parties, a written notice of appeal which must specifically designate the Order or part of the Order from which appeal is taken and the basis for the objection.

---

harassment complaint with the New Jersey Department of Civil Rights). In the present case, the ability of Plaintiff to discover statements that were made by RPS employees does not depend upon when the statements were made; rather, the discoverability of these statements is premised, first, on the fact that they were made to Attorney Spelfogel, and, second, that they relate to Plaintiff's allegations of sexual harassment. Further, Defendant may not avoid the Court's ruling merely by substituting another attorney from Attorney Spelfogel's firm to represent it in this action. *See generally* ABA Model Rule of Prof'l Conduct 1.6 (noting that attorney-client privilege may be imputed to all members of

attorney's firm). Employers in Defendant's situation may avoid this result in the future either by foregoing the "reasonable investigation" defense or by separating the role of investigator from litigator. *Harding,* 914 F.Supp. at 1099.

**6.** Although the five statements made on March 10, 1997 appear to have been transcribed by the same person, each one reads as if it were dictated by the applicable employee. Further, the phrase I have read the above and it is true to the best of my knowledge and belief' appears above the applicable employee's signature. Accordingly, the Court finds that the statements are properly attributable to each employee.